## Pittsburgh City Fire Fighters Local No. 1, Appellant, v. Barr.

Argued May 22, 1962. Before BELL, C. J., MUS-
MANNO, COHEN, EAGEN and O'BRIEN, JJ.

*Allan H. Cohen,* with him *Arthur D. Gatz, Jr.,* and
*Gatz, Cohen & O'Brien,* for appellant.

*David W. Craig,* City Solicitor, with him *Marion
K. Finkelhor,* Assistant City Solicitor, for appellee.

Opinion by Mr. Justice Cohen, July 30, 1962:

This is an appeal from an order of the Court of Common Pleas of Allegheny County sustaining preliminary objections to appellant's complaint in mandamus to compel appellee, the City of Pittsburgh (City), to submit to the grievance procedures of the Act of 1947, June 30, P.L. 1183, as amended, 43 P.S. §215.1.

Appellant, Pittsburgh City Fire Fighters (Fire Fighters) is an organization representing firemen employed by appellee in the bureau of fire. In 1960, City granted a wage increase to the firemen but refused Fire Fighters' demand for a wage formula tying in the wages of firemen to other wages in the city. Thereupon, the union requested City to submit this issue to a panel appointed under the Act of 1947. City refused and appellant filed its action in mandamus. City filed preliminary objections in the nature of a demurrer to the complaint and requested that it be dismissed for failure to state a cause of action. The court below sustained the preliminary objections and dismissed the complaint. This appeal followed.

The purpose of the Act of 1947 is clearly set forth in section 1 of its provisions which, in pertinent part, states: ". . . In order to avoid or minimize any possible controversies by making available full and adequate governmental facilities for the *adjustment* of grievances, the governmental agency involved, at the request of the public employes, shall . . . set up a panel of three members, one to be selected by the employes, one by the governmental agency, and the two so selected to select a third member." The Act of 1947 was an attempt by the legislature to provide a type of grievance machinery in aid of public employees who, by proscription of law (43 P.S. §215.2) are forbidden to go out on strike. The findings of the panel are merely advisory and are not binding upon the

governmental authorities. The prime purpose of the legislation was to furnish a forum to which aggrieved public employees could carry their demands and there subject them to the light of public opinion. *Erie Firefighters Local No. 293 v. Gardner*, 26 Pa. D. & C. 2d 327 (1961), aff'd per curiam 406 Pa. 395, 178 A. 2d 691 (1962).

The only issue confronting us here is whether the provisions of the Act of 1947 providing for the "adjustment of *grievances*" is applicable to disagreements between a municipality and its employees concerning the adoption of new contractual provisions relative to a wage plan.

The courts in this Commonwealth have not previously considered what constitutes a grievance under the Act of 1947. There is, however, adequate authority in the field of industrial and municipal labor relations to assist us in our analysis of this question.

In *Elgin, Joliet and Eastern Railway Co. v. Burley*, 325 U.S. 711, 89 L. Ed. 1886, 65 S. Ct. 1282 (1945), the United States Supreme Court held that under the Railway Labor Act of 1934, 48 Stat. 1185, c. 691, as amended, 45 U.S.C.A. §151 et seq., the individual employee has the right to control the processing of his own grievances regardless of the existence of a collective bargaining agent among the employees. During the course of its opinion the court differentiated between disputes concerning the making of collective agreements and disputes over grievances in the following terms:

". . . Congress has drawn major lines of difference between the two classes of controversy.

"The first relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the

issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

"The second class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement. . . . In either case the claim is to rights accrued, not merely to have new ones created for the future.

. . .

"The so-called minor disputes, . . . involving grievances, affect the smaller differences which inevitably appear in the carrying out of major agreements and policies or arise incidentally in the course of an employment. They represent specific maladjustments of a detailed or individual quality. . . ." (325 U. S. at 723, 724).

In *West Texas Utilities Co. v. National Labor Relations Board,* 206 F. 2d 442, 446 (1953), cert. den. 346 U. S. 855, 98 L. Ed. 369, 74 S. Ct. 70 (1953), the United States Court of Appeals for the District of Columbia stated: ". . . As we view the word 'grievances' it does not encompass, for example, the setting of wage rates for a large percentage of the employees in a certified bargaining unit. The word 'grievances,' in the field of industrial relations, particularly in unionized companies, usually refers to 'secondary disputes in contrast to disagreements concerning broad issues such as wage rates, hours and working conditions.' . . ." See also *Chicago River & Indiana Railroad Company v. Brotherhood of*

*Railroad Trainmen,* 229 F. 2d 926 (1956), aff'd 353 U. S. 30, 1 L. Ed. 2d 622, 77 S. Ct. 635 (1957).

We are also cognizant of cases taking a contrary position. In *National Labor Relations Board v. Kearney and Trecker Corporation,* 237 F. 2d 416 (1956), the United States Court of Appeals for the Seventh Circuit stated that under section 9(a) of the National Labor Relations Act of 1935, 49 Stat. 453, as amended, 29 U.S.C.A. 159: "a 'grievance' is not necessarily limited to minor matters but may entail problems arising under a collective bargaining agreement. . . ."

Similarly, in *National Labor Relations Board v. North American Aviation, Inc.,* 136 F. 2d 898 (1943), the Court of Appeals for the Ninth Circuit pointed out that grievances do not encompass merely "small out-of-mind" matters. See also the comments of Chief Judge LEARNED HAND in *Douds v. Local 1250, Retail Wholesale Department Store Union of America, C.I.O.,* 173 F. 2d 764 (1949) in regard to this question.

In the only case we could find involving the duty of a *governmental* body to submit to mediation "grievances" with its employees, the Michigan Supreme Court, in *Garden City School District v. Labor Mediation Board,* 358 Mich. 258, 99 N.W. 2d 485 (1959) held that the state labor mediation board had jurisdiction to mediate disputes relative to salaries and other conditions of employment between a school board and its teachers. In the course of its opinion, the court stated: ". . . The word 'grievance' must be read in the statute in its generally accepted sense, rather than as defined by usage in some contract cases. We know of no grievance more likely to provoke the sort of dispute which the labor mediation board [is] . . . designed to avoid than those concerning wages or salary." (99 N.W. 2d at 488). As in the case of the Pennsylvania provision (43 P.S. §215.1), the Michigan statute does not define the term "grievances."

After consideration of both positions, we are persuaded that the interpretation of grievances evidenced in the latter group of cases is the proper one in the context of the relationship of governmental employees to their governmental unit. This relationship is not analogous to that of an industrial worker with his company. The latter, through his bargaining agent, enters into contractual negotiations with the employer at periodic intervals—usually, immediately prior to the expiration of the existing contract. At such time, the union representatives and the company officials sit down and review the existing collective bargaining agreement, provision by provision. Through this process, they arrive at mutually agreeable provisions relative to wages, working conditions, vacation benefits, unemployment security and the host of other details relevant to modern day employment.

These provisions remain in force until the contract expires. Prior to expiration, they will, once again, be renegotiated.

During the interim, while the contract is in force, alleged abuses or violations of the provisions are handled by the grievance procedure provided for under the collective bargaining agreement. Such grievances concern disturbances in the daily course of labor-management relations. Accordingly, in our opinion, the adjustment of "grievances" in the industrial context does not encompass the consideration of major contractual revisions which go to the heart of the collective bargaining agreement between the parties.

The situation of the municipal employee, however, is far different. While governmental units recognize unions, such as Fire Fighters, as the bargaining agents of the municipal workers, they do not sit down and enter into collective bargaining agreements containing provisions governing employment. Indeed, absent statutory authorization, a governmental unit does not have

power to bind itself to its employees by the terms of a contract. See *Scott v. Philadelphia Parking Authority*, 402 Pa. 151, 166 A. 2d 278 (1960). Rather, wages, hours, retirement benefits and many other conditions of employment are established by ordinance or directive of the duly authorized municipal authority—in the instant case, the Pittsburgh City Council. Similarly, many of the details concerning the day-to-day working conditions of municipal employees (e.g. type of shifts, clothing requirements, etc.) are regulated by order of the proper administrative department—here the fire bureau. Provisions contained in ordinances relative to wages and other matters can be changed only by getting the city council to amend or rewrite the ordinance. Revision of such provisions does not come about from a periodic review of a labor contract as in the industrial context, but results solely and exclusively from the decision of the city authorities to change the existing terms by the enactment of new or amended legislation.

Accordingly, grievances affecting city employees are not merely the day-to-day complaints which normally are settled by the grievance procedure in the industrial context. Rather, in the governmental situation, these grievances also concern the main elements of an employment relationship—wages, hours, working conditions, etc.,—matters which in the industrial situation are determined in the collective bargaining agreement.

Before appellants must present their wage demands to city council, they have the right to discuss such demands with municipal officials through the machinery of the grievance procedure. There, through the airing of the respective positions of the parties and the attendant coverage by the news media, appellant and other city employees, are afforded ample opportunity to place their position before the public and muster public sentiment on their side. Equally as important,

through such a process, the parties often are able to arrive at a mutual understanding of their respective positions, thereby making the final negotiations more fruitful.

That it was within the contemplation of the legislature that major employee demands relative to wages, hours and working conditions would be discussed under the procedures of the Act of 1947 is demonstrable by the section referring to "adjustment of grievances" (above quoted) and by a second portion of the same provision. This provides: ". . . [N]othing contained in this act shall be construed to limit, impair or affect the right of any public employe to the expression or communication of a view, grievance, complaint or opinion on any matter related to the conditions or compensation of public employment, or the betterment thereof. . . ." (43 P.S. §215.1).

In *Broadwater v. Otto*, 370 Pa. 611, 88 A. 2d 878 (1952), we held that before one could utilize the grievance procedure of the Act of 1947, he must be an employee of the governmental unit, and that a former employee could not assert as his grievance his allegedly improper discharge as an employee. In the course of the opinion, the court quoted an opinion given by the late Justice THOMAS MCKEEN CHIDSEY when he was attorney general of the Commonwealth, wherein he stated, " '. . . "It is quite clear that the grievance machinery was to provide for presentation of complaints respecting working conditions and compensation by those in employment and affected thereby, and the consideration of such complaints during employment in order to deter strikes in accordance with the over-all purpose of the legislation." ' "

Accordingly, it is our opinion that to deny municipal employees the right to invoke grievance machinery to present demands concerning wages, hours and working conditions would be to defeat the entire purpose

of the Act of 1947. The providing of this facility for discussion is designed in no small measure to compensate for the inability to strike.

Indeed, it is difficult to believe that the legislature would have provided the elaborate process of hearings and of administrative review in section 1 of the Act (43 P.S. §215.1) if it were not contemplated that major areas of employee-government relations would be handled by the grievance procedure.

In deciding that the City must appoint a member to a panel which will hear the appellant's wage formula demands, we in no way determine the propriety of said demands or whether or not City could constitutionally adopt the wage plan desired. Indeed, the record is bare as to any detailed information regarding such wage formula and we are unable to evaluate its features. Moreover, our holding in *Erie Firefighters v. Gardner,* supra, obviates the necessity of our deciding this question entirely since we there held that the recommendations of the panel are not binding on the municipality. Consequently, we need not concern ourself with the suitability of the particular scheme.

Accordingly, since under the Act of 1947, City is obligated to name a member of a panel to discuss wages for firemen, and it has refused to do so, mandamus is the proper remedy to compel the appointment of a panel member to participate in the grievance machinery. It is long settled that mandamus will lie to compel a public officer to perform a mandatory or ministerial act which he is legally obliged to perform and which the complainant is legally entitled to receive. See *Getz v. Lehighton Borough,* 407 Pa. 357, 180 A. 2d 230 (1962) ; *Travis v. Teter,* 370 Pa. 326, 87 A. 2d 177 (1952). The lower court, therefore, improperly dismissed appellant's complaint in mandamus.

Order reversed with a procedendo.

Mr. Chief Justice BELL dissents.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO, filed August 7, 1962:

A fireman, like a policeman, merits the highest commendation of the citizenry of the land because he is ever ready to jeopardize life and limb for the safety of the home, the family, and the security of the neighborhood and the community in which he discharges the vital duties of his position. It is, therefore, exceedingly regrettable that he should become involved in a legal controversy concerning the very least to which he is entitled, a proper wage. However, what is proper and what is not, is a matter to be decided in accordance with certain established legal procedures. This is necessary if the public well-being, which the fireman protects from the ravages of flame and flood, is not to be seriously damaged through the breakdown of governmental order.

The record in this case shows that the plaintiffs presented their proposition for a certain wage formula before the city council, the only body that has the authority to grant the plaintiffs that "wage formula." It is the city council which must determine the whole wage structure of city employees because it is the council which is charged with raising the money to pay the wages. The council granted the plaintiffs a wage increase but declined to give, with the wage increase, the "wage formula" requested.

On January 27, 1961, the plaintiffs wrote a letter to the mayor of Pittsburgh asking for the invocation of the Act of June 30, 1947, P. L. 1183 (sometimes known as the Public Employees Anti-Strike Act). On February 16, 1961, they went into the Court of Common Pleas of Allegheny County seeking a writ of mandamus to compel the City to "comply with the terms of the Act of June 30, 1947, P. L. 1183, as amended, for the establishment of an *arbitration* panel for the adjustment of the wage rate controversy and grievance

involving the fire fighters employed in the Bureau of Fire of the City of Pittsburgh and to select its member for the *arbitration* panel." (Emphasis supplied)

The city demurred and the Court of Common Pleas of Allegheny County sustained the demurrer. The plaintiffs appealed.

I respectfully submit that the suit in this case was ill-advised because it disregarded the very Act (that of 1947) on which the suit was based. The plaintiffs' complaint makes frequent reference to "arbitration," but it is a matter of simply reading the Act of 1947 to note that in the whole statute the word "arbitration," or any derivative thereof, is *not mentioned once.* I state, again with respect, that the plaintiffs, in pursuing their action under this Act of 1947, have been apparently misled as to the substance, the letter, the spirit and the whole objective of that law. Ever since January, 1961, the plaintiffs have been calling for arbitration under the Act of 1947, when, I repeat, that Act contains not the slightest reference to arbitration.

In the plaintiffs' letter of January 27, 1961, to the mayor of Pittsburgh they ask for the appointment of a "three man arbitration panel." But there is no provision in the Act of 1947 for any such "arbitration panel."

. For many months now the plaintiffs have been picketing the City-County Building, which houses the offices of the mayor of Pittsburgh, carrying large signs reading: "Barr bars arbitration." This assertion does not accord with the facts because, I repeat and emphasize, the Act of 1947 does not authorize, permit or even suggest arbitration. Mayor Barr cannot be charged with barring something he cannot legally do. No one could say that Mayor Barr bars the calling of a session of the Legislature since he has no authority to call a session of the Legislature. Equally, he has no authority, under the Act of 1947, to arbitrate the matter which is the subject of the plaintiffs' request.

This whole case is built on a complete misconception of the law. I repeat, deferentially, that the firemen (for whom I have great respect because of the hazards they constantly confront in behalf of public safety) have been misadvised, miscounselled, and misdirected. Even a hasty glance at the Act of 1947 will show that its motif is "grievance procedure." What is a grievance? It refers to something which has already happened. A person is hurt—physically, morally, legally —and he has a grievance. The Act of 1947 provides for an airing of grievances. Under the Act of 1947, the plaintiffs would have the right to complain, for instance, on such matters as hours of employment, working conditions, assignments,—matters which had already found expression on the tablet of time through experience and chronicle. Such hypothetical complaints would be subjects for consideration under the Act of 1947 since they would be based on events which were fait accompli. But the plaintiffs would not have the right, under the Act of 1947, to demand certain terms of employment and wages *in the future.*

The plaintiffs are not asking for a decision on a grievance as specified in the Act of 1947, they are asking for a "wage formula." A wage formula applies to the future, but a grievance looks to the past.

The plaintiffs' complaint cannot even be designated a demand for wage increase because a wage increase was accorded to them by city council before this proceeding in mandamus was initiated. What the plaintiffs are demanding is a "formula", a formula involving collective bargaining. But collective bargaining in this case cannot be denominated a grievance.

The distinction between grievance on one hand and disputes concerning collective bargaining on the other hand is well recognized in labor law. The Supreme Court of the United States declared in *Elgin, Joliet and Eastern Rwy. Co. v. Burley,* 325 U. S. 711, that: "The

difference between disputes over grievances and disputes concerning the making of collective agreements is traditional in railway labor affairs."

The United States Circuit Court of Appeals in *Hughes Tool v. National Labor Relations Board,* 147 F. 2d 69, said: "Taking the quoted provisions together [NLRA], it is plain that collective bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment which will fix for the future the rules of employment for everyone in the unit, is distinguished from 'grievances', which are usually the claims of individuals or small groups that their rights under the collective bargain have not been respected."

. It will be noted from the decision of this illustrious court that "grievances" refers to rights "under the collective bargain." But there has been no governing collective bargain in this case in which the city agreed to give what the plaintiffs ask. Hence, there can be no grievance in its legal sense. You cannot legally complain over what you have no legal right to demand.

It is highly significant that on the same day that the Public Employees Anti-Strike Act (the one here under discussion) was passed, the Legislature enacted the Public Utility Employees Act of June 30, 1947, P. L. 1161, 43 P.S. 213.1. That Act specifically refers to the "making and maintaining of agreements concerning wages, hours and other conditions of employment through *collective bargaining* between public utility employers and their employes." (Emphasis supplied)

But the term "collective bargaining" boldly stated in the Public Utility law is conspicuously absent from the Public Anti-Strike law. It can therefore, only be conclusively assumed, especially since both acts were enacted on the same day, that the Legislature intended to draw a distinction between a panel procedure over

grievances and an authoritative procedure involving collective bargaining. Collective bargaining inevitably applies to wage rates, wage structures *in futuro*. Grievances, as I have already stated, apply to what has passed.

In addition, let it be noted that the Public Utility Employees Act spells out what the pertinent board shall consider, namely, "all pertinent factors and shall establish rates of pay and conditions of employment comparable to prevalent wage rates paid and conditions of employment maintained for the same or similar work of workers exhibiting like or similar skills . . ." (Act of June 30, 1947, P. L. 1161, §11, 43 P.S. 213.11).

There is a complete void of any such language in the Public Employees Anti-Strike Act. This Act provides: "In order to avoid or minimize any possible controversies by making available full and adequate governmental facilities for the *adjustment of grievances,* the governmental agency involved, at the request of the public employes, shall set up a panel of three members, one to be selected by the employes, one by the governmental agency, and the two so selected to select a third member . . ." (Emphasis supplied).

The term "adjustment of grievances" cannot by any possible elasticity of interpretation be made to include the determination of future wages. If A goes to B and says that from then on B must pay A $100 a month and B refuses to pay as directed, certainly A has no grievance against B. A must first prove that he has the right to the $100 a month and then if it is not paid he has a grievance. The plaintiffs here have not proved that they have a right acknowledged by law to the formula they request. They have not proved any promise that they would get such a formula. Where, then, is the grievance in the legal sense, a grievance which the courts can adjudicate? The plaintiffs have expressed a desire and a hope, but this cannot warrant

and justify a court in issuing a writ of mandamus, one of the most powerful writs known to law.

In *Com. ex rel. McLaughlin v. Erie County,* 375 Pa. 344, we said: "It is a fundamental principle that mandamus will not issue as a rule, where it is apparent that the writ will be futile or ineffectual by reason of the inability of the respondent to comply therewith."

The plaintiffs have in effect filed an action which asks for a futility. As nature abhors a vacuum, the law deplores the abortive. The panel which the Majority decision has ordered formulated cannot do anything more than has already been done, namely, listen to what the plaintiffs and the city have already presented before the city council which, as I have stated, is the only authoritative tribunal which can give a decision on the "wage formula" in question. The panel, it is true, may make recommendations, but the recommendations will have no binding effect whatsoever. It should be obvious that no panel may fix salaries of Pittsburgh's municipal employees. To permit such a procedure would be an unlawful and unconstitutional delegation of power. As we said in *Richardson v. Philadelphia,* 312 Pa. 173, "the salaries of municipal employees should be fixed by the body which raises the funds to pay them."

The decision in this case resolves nothing. The object of a court adjudication is to terminate a conflict, finalize a controversy, write finis to an existing disagreement. The Court's decision here does nothing of the kind. It provides for a panel which will sift shadows. It will labor and strive, but in the end its labor will be the labor of Sisyphus.

The Majority's decision may unfortunately accomplish more than a mere negation. It may encourage similar actions in other municipalities of the Commonwealth, actions which may stir up disharmony and which can only end in the pursuit of a mirage. Prob-

lems are resolved by gripping with realities and not by fencing with figures of straw.

I dissent.